## SCOTT v. WARD.

By the Mexican law, one-half interest in the community property vested in the wife upon the death of the husband, and was not subject to his testamentary disposition.

The same rule prevails under our statute.

The case of the matter of the *Estate of Buchanan*, (8 Cal. 507,) affirmed.

Under the Spanish and Mexican law, property acquired by husband and wife during the marriage, and whilst living together, whether by onerous or lucrative title, and that acquired by either of them by onerous title, belonged to the community; whilst property acquired by either of them, by lucrative title solely, constituted the separate property of the party making the acquisition. The fruits, and profits, and increase, of the separate property, also, belonged to the community. By onerous title was meant that which was created by a valuable consideration, as the payment of money, the rendition of services, and the like, or by the performance of conditions, or payment of charges, to which the property was subject. Lucrative title was created by donation, devise, or descent.

Where a Mexican grant contained the following clauses designated in the instrument as conditions, namely: "1st. Neither the grantee nor his heirs can divide, nor alienate the premises granted to them, nor place upon said premises any mortgage or other charge, even though such mortgage or charge be for pious purposes, nor shall they convey the said premises in *mortmain*. 2d. He may inclose the premises without prejudice to the roads and the easements; he shall enjoy the premises freely and exclusively, devoting them to such cultivation and use as he may see proper. 3d. When the property shall be confirmed to him, he shall ask the proper Judge that he give him juridical possession in virtue of this title, for which purpose the boundaries shall be marked, and some

landmarks shall be placed about said premises. 4th. The land which is embraced in this grant, is only that which is named in the petition of the grantee, and which is delineated in the sketch attached hereto, and the Judge who shall give him possession thereof, shall make to this government a report of the quantity of land comprised in the grant." *Held*, that these clauses were not properly conditions, and that there was nothing in any of the provisions which was onerous or burdensome to the grantee, or which could be regarded as a valuable consideration, moving the government to make the grant.

Donations may be absolute, or accompanied with conditions, the performance of which may be essential to the enjoyment of the property donated. It would seem that under the Spanish and Mexican law, a more comprehensive meaning was attached to the term donation than that usually given to it in our jurisprudence.

Onerous conditions were not necessarily attached to grants issued under the colonization laws of Mexico.

The land granted with the conditions above specified, constituted the separate property of the grantee, and passed to his devisees. The conditions did not change the transaction from that of donation to one of contract or purchase.

The recital in the grant that the grantee solicited the land for his personal benefit and that of his family, does not control the operative words of the grant.

APPEAL from the Third District.

This case was presented upon an agreed statement of the case under the 377th Section of the Practice Act. The facts are as follows: In February, 1830, Ygnacio Alviso and Maria Louisa Peralta were intermarried. In July, 1835, Alviso petitioned the Governor of California for a grant of the place called "Rincon de los Esteros." The Governor referred the petition to the Ayuntamiento of San José, and to the Reverend Father, minister of the Mission of Santa Clara. A favorable report was received from both the Ayuntamiento and the Minister, and in February, 1838, Juan B. Alvarado, then Governor of California, issued to Alviso a grant for the place for which he had petitioned. This grant was afterwards confirmed by the Departmental Assembly of California. The following are copies of the petition of Alviso, the order referring the same to the Ayuntamiento and Reverend Father, their reports in relation to the same, the decree of the Governor thereon, the grant to Alviso, and the certificate of the confirmation of the grant by the Departmental Assembly:

"SEAL THIRD—TWO REALS.

Provided provisionally by the Maratime Custom-House of Monterey, Upper California, for the years one thousand eight hundred and thirty-four and thirty-five.

FIGUEROA.                                                    A. RAMIREZ."

" *Superior Political Chief* :
The citizen Ygnacio Alviso, of the Pueblo de San José Guada-

lupe, before your Excellency presents himself, and says, that to secure the cattle and horses which he has, I apply to your Excellency to grant to me the place named Rincon de los Esteros, according to the accompanying map, bounding with José Maria Alviso, José Higuera, the Pueblo de San José Guadalupe and the Mission of Santa Clara. Wherefore, I pray your Excellency to grant it to me, if you see proper, by which I shall receive favor, swearing to what is necessary.

YGNACIO ALVISO.

Santa Clara, July 27, 1835."

" MONTEREY, August 12, 1835.

In accordance with the laws relative to the subject the Ayuntamiento of San José Guadalupe will report whether the petitioner possesses the requisites to entitle him to what he asks, if the land he asks for is not comprised in the twenty limiting leagues, but in ten littoral leagues mentioned in the law of August 18th, 1824; whether it belongs to any individual, mission, corporation, or pueblo, and all else relating to it. This done, transfer this espediente to the reverend fathers, Ministers of the Mission of Santa Clara, that they may report in relation to the matter. José Figueroa, General of Brigade, General Commandant and Inspector, and Superior Political Chief of the Territory of Upper California, so I order, decree, and sign, which I certify.

JOSE FIGUEROA,<br>FRANCISCO DEL CASTILLO,<br>NEGRETE, Sec'y."

" This illustrious Council having examined with care as well the petition of the citizen, Ygnacio Alviso, as the respectable decree of your Excellency, of the date of August 12th, 1835, has seen fit to make the following report : The land is not irrigable, but subject to the season, having watering-places ; it is not comprised within the twenty limiting leagues, nor the ten littoral leagues. The petitioner is a Mexican citizen, who has performed many services to the country, and is a retired Sergeant; that the land does not belong to any individual nor mission, and it does belong to the commons of this pueblo, in view of the fact that the petitioner possesses it with the consent of this council,

Scott *v.* Ward.

and does no injury. Your Excellency, considering the whole subject, will do what is proper.

Pueblo de San José Guadalupe, Sept. 14, 1835.

ANTONIO MA. PICO.

Transfer this espediente to the Reverend Father, Minister of the Mission of Santa Clara."

" *Superior Political Chief :*

In obedience to the preceding decree of your Excellency, I say, that the place asked for does not belong to this mission, nor to any individual, but it does belong to the commons of the pueblo of San José Guadalupe. It is subject to the season ; has watering-places, and is not irrigable. Also, that it is not comprised within the twenty limiting leagues, but is within the ten littoral leagues.

The petitioner is a Mexican citizen, a retired Sergeant, with numerous cattle. He has a family, and is deserving and meritorious for his services done for the territory, for which, in my opinion, he is deserving of any favor.

Mission of Santa Clara, Sept. 19, 1835.

FATHER RAFAEL DE JESUS MORENO,
Minister of said Missions."

" MONTEREY, February 10, 1838.

Having examined the petition with which this espediente commences, the report of the municipal authority of the Pueblo de San José, with all else, in conformity with the laws relating to the subject, Ygnacio Alviso is declared the owner in property of the land called Rincon de los Esteros, according to the accompanying map, and within the limits marked upon it, subjecting himself to the conditions established by the laws of August 18th, 1824, and the regulations of November 21st, 1828. Let the corresponding dispatch be issued and a record made in the proper book, and direct this espediente to the Most Excellent Deputation for its approval, in which case the grantee to whom this decree is made known will present his title again that it be revalidated. So Juan B. Alvarado, Political Chief *ad interim* of Upper California decreed, which I certify.

JUAN B. ALVARADO."

### "GRANT TO YGNACIO ALVISO.

*The Citizen Juan B. Alvarado, Political Chief ad interim of Upper California :*

Whereas, Ygnacio Alviso, a Mexican by birth, has solicited, for his personal benefit and that of his family, the land known by the name of Rincon de los Esteros, between the marked lines in the map, which accompanies the petition for the said tract; having previously taken the proper steps according to what is prescribed by the laws and regulations, in virtue of the power in me vested in the name of the Mexican nation, I have granted the said property to him by these presents, in conformity with the law and subject to the approval or disapproval of the Departmental Assembly and the following conditions :

1. Neither the grantee nor his heirs can divide nor alienate the premises granted to them, nor place upon said premises any mortgage or other charge, even though such mortgage or charge be for pious purposes; nor shall they convey the said premises in *mortmain.*

2. He may inclose the premises without prejudice to the roads and easements; he shall enjoy the premises freely and exclusively, devoting them to such cultivation and use as he may see proper.

3. When the property shall be confirmed to him, he shall ask the proper Judge that he give him juridical possession in virtue of this title, for which purpose the boundaries shall be marked, and some landmarks shall be placed about said premises.

4. The land which is embraced in this grant is only that which is named in the petition of the grantee, and which is delineated in the sketch attached hereto, and the Judge who shall give him possession thereof shall make to this government a report of the quantity of land comprised in the grant.

Wherefore, I order that these presents shall constitute his title, and shall be deemed good and sufficient, and that a memorandum of it shall be inscribed in the proper book, and that these presents be delivered to the grantee for his use.

Given in Monterey, in the Department of the Californias, on the tenth day of February, one thousand eight hundred and thirty-eight.

JUAN B. ALVARADO."

The approval of said grant by the Departmental Assembly:

"*Juan B. Alvarado, Constitutional Governor of the Department of the Cálifornias:*

The most excellent Departmental Assembly, in session on the 26th day of May of the present year, approved the concession which this government made under date of 10th of February, 1838, of the land called Rincon de los Esteros, to the citizen Ygnacio Alviso, in the words following: ' Sec. 1st. The grant made by the Departmental Government, under date of February 10th, 1838, of the land called Rincon de los Esteros, to the citizen Ygnacio Alviso, is hereby approved.'

Certified for the benefit of the grantee, May 30th, 1840.

JUAN B. ALVARADO.

Manl. Jimeno, Departmental Secretary."

Alviso died in 1848. His wife, Maria Luisa Peralta, survived him, and was living on the 5th of November, 1857. There were no children by this marriage, but by a previous marriage Alviso had several children, among whom was a son named Domingo, and a daughter named Dolores. Domingo was married, and had several children in the lifetime of Alviso.

Alviso left a last will and testament, by which, after directing his Executors to sell, for the payment of his debts, the portion of the rancho which lies between the Coyote and the Penitencia creeks, he undertook to devise the half of what remained, lying to the northwest, to his daughter, Dolores, and the half lying to the southeast, to the children of his son, Domingo; excepting, however, from the portion so devised, the place called Chino, which he directed "might be at the disposal of the widow of his son, José Maria"—but leaving no portion whatever of the rancho aforesaid to his widow, Maria Luisa.

Whatever title Dolores derived from the will of her father, in the portion of the rancho devised to her, is now held by the defendant. Whatever interest the widow, Maria Luisa, held in the same tract of land, by virtue of her marital rights, was conveyed by her, on the 5th of November, 1857, to William T. Wallace, and on the 22d of December of the same year was conveyed by Wallace to the plaintiff.

Upon this state of facts, the defendant claimed to own the whole tract thus devised—the plaintiff claimed to be a tenant in common with him, and to own the undivided half of the said tract; and the parties prayed the judgment of the Court whether the plaintiff was entitled to recover the undivided half claimed by him.

The Court below rendered judgment in favor of the defendant, and the plaintiff appealed.

*William Mathews,* for Appellant.

If, by the grant made to Alviso in 1838, the land became his separate property, the Appellant admits that the devise to the daughter, Dolores, was valid; or at least, that neither the widow of Alviso, or any person holding under her, can dispute its validity. Assuming it to be community property of the marriage, the devise had no legal effect, as to more than an undivided half of the land, as against the surviving spouse.

The community property of a marriage, in consideration of the Mexican law, was on the death of one of the spouses, at the instant of death, divided between the survivor and the children of the deceased. (Escriche Diccionario, Tit. Bienes Gananciales.) On the other hand, the will of the testator only took effect after his death. (*Buchanan's Estate,* 8 Cal. 519; *Beard* v. *Knox,* 5 Id. 256.)

Whether this land belonged to the community property of the marriage, or to the separate estate of Alviso, must be determined by the Mexican law as understood in California at the time of its grant—in other words, by the Mexican law and the customs of the country.

Ganancial property is thus defined by Escriche: "Whatever the husband and the wife acquire during the marriage and living together, by common lucrative or onerous title; or that which the husband and wife, or either of them, during the marriage and living together, acquire by purchase or by means of their labor or industry; as also the fruits of the separate property which each brings to the marriage; and of that which either acquires for himself by any lucrative title, whilst the conjugal society subsists." (El Diccionario, Tit. Bienes Gananciales.) This definition is less felicitous than that given by Feb-

rero: "Whatever is acquired or gathered together during the marriage, by the husband and the wife, or by either of the two, is called ganancial property; as likewise the fruits of the separate property which either had brought to the marriage, or had taken for themselves while it subsisted, by any title whatsoever." (Febrero, Tom. 1, p. 76.) This principle has been fully adopted by our statute. (Wood's Dig. 2d Ed. 487.) "The ganancial property is the common property of the husband and wife, and belongs the half to each of them; although the husband has more separate property than the wife, or the wife more than the husband; although one, after marriage, acquires more than the other; and although it may be one alone who by commerce or toil, accumulates the property; since by virtue of the marriage, there is established between the two consorts, a partnership, though legal, different from others, in that the acquisitions are the property of each, in equal proportion." (Escriche, Ubi, Supra.)

As the natural fruits of the separate property of each of the spouses are to be regarded as somewhat the result of labor, they are considered as belonging to the community. (Id.)

On the contrary, the improvements and augmentations to the property of one of the spouses, caused by nature or time alone, without labor or skill, are regarded the separate property of such spouse. (Id.)

Guided by these principles, it is submitted that the grants of land by the Mexican Government, for the purposes of colonization, are to be regarded as the community property of the marriage, and not the separate property of the spouse, in whose name the land is granted.

The object of Mexico in making her grants was to colonize the country. The empire, and afterwards the republic, possessed immense tracts of wild land, which, when inhabited at all, were inhabited by savages whose depredations desolated her frontiers. The territories of Coahuila and Texas, New Mexico, and the Californias, were eminently in this condition. The introduction and establishment of settlers in these territories was the means adopted by her to remedy this evil.

A citizen could leave the country, and might alienate his lands before his departure, but he could not abandon the country and

still hold his lands. (Id. Art. 23 ; *Holliman* v. *Peebles,* 1 Texas, 673.) Most of the colonization grants contained the recital that the grant was made for the "personal benefit" of the applicant, and that "of his family." Such a recital is found in the grant in the record. The history of the country shows that these inducements and advantages offered to colonists were necessary. (*Reading's Case,* 18 How. 5.)

The method of soliciting the grants was tedious and costly. The proceedings extended not unfrequently through a series of years. The proceedings in the record commenced in 1835, and ended in 1838.

Surely these grants, obtained and held with such difficulty, are not to be considered gifts from the government, but as purchases dearly paid for. They were so regarded by the Mexican law. Escriche, in enumerating the various classes of community property, places in his list "that which the husband acquires by military or governmental services, and the recompense for them, which the government gives him, provided he serves without pay, and maintains himself from the common resources of the marriage." (Tit. Bienes Gananciales; Ley 2, Tit. 4, Lib. 10, Nov. Rec.)

The colonization grants were so regarded by the Courts of California, and so treated by its population; the custom of the country in this respect had the force of law. (*Arredondo's Case,* 6 Pet. 715; *Von Schmidt* v. *Huntington,* 1 Cal. 56; *Castro* v. *Castro,* 6 Id. 160; *Tevis* v. *Pitcher,* 10 Id. 477; *Stafford* v. *Lick,* 10 Id. 12.)

The Supreme Court of the United States has held, in the Florida, Louisiana, and Missouri cases, that concessions and grants made on condition that the grantees should occupy, cultivate, work or graze, the lands granted, were contracts between the government and the grantees. (*Seton's Case,* 10 Pet. 309; *Sibbald's Case,* Id. 313; *Arredondo's Case,* 6 Pet. 691; *U. S.* v. *Heirs of Forbes,* 15 Id. 173; *Same* v. *Heirs of Buyck,* Id. 215; *Same* v. *O'Hara et als.* Id. 275; *Same* v. *Smith,* 10 Id. 327; *Same* v. *Boisdore,* 11 How. 63.)

These cases differ from those based on unconditional grants, made by the government in consideration of past meritorious services. Such were the following cases: *U. S.* v. *Fernandez et al.* 10 Pet. 303; *Segui's Case,* Id. 306; *U. S.* v. *Benjamin Chaires*

Scott *v.* Ward.

*et al.* Id. 308; *Same* v. *Antonio Huertas,* 9 Id. 171; *Same* v. *Clark,* Id. 168.

These grants were the separate property of the husband, or the community property of the marriage, according to whether the grant was or was not made in payment for services rendered during the marriage.

In the California cases, the Court has acted upon the same views. It holds the grants to be contracts, and admits it was in the power of the Mexican Government to declare these lands forfeited upon the failure to perform the conditions annexed to them. (*Fremont's Case,* 17 How. 542.)

The Texas cases establish the doctrine which the Appellant contends for. The chain of authorities in that State is unbroken. (*Yates* v. *Houston,* 3 Tex. 433; see, also, *Burris* v. *Wideman,* 6 Id. 231; *Edwards* v. *James,* 7 Id. 372; *Parker* v. *Chance,* 10 Id. 513; *Smith* v. *Strahan,* 16 Id. 314.)

*S. O. Houghton,* for Respondent.

The grant to Ygnacio Alviso commences with the recital that " Whereas, Ygnacio Alviso, a Mexican by birth, has solicited, for his personal benefit and that of his family, the land known by the name of Rincon de los Esteros," etc. and then follows the grant by the Governor : " I have granted the said property to him by these presents, in conformity with the law," etc.

The Spanish law in force in California at the date of the grant provides that : " Everything acquired or purchased by husband and wife jointly they shall have equally by halves ; and if it be a gift from the King, or from another, and it be given to both of them, the husband and wife shall have it equally, and if it be given to one of them, that one alone shall have it to whom it is given." (L. 1, Tit. 41, Lib. 10, Nov. Recop. ; L. 1, Tit. 3, Lib. 3, del Fuero Real.)

Community property under the Spanish law is defined to be that which the husband and wife, during marriage and while living together, acquire by a joint lucrative title, or by onerous title, and that which the husband and wife, or either of them, during marriage and while living alone, acquire by purchase or by laborious industry. (Escriche, Bienes Gananciales.)

Property acquired by gift, devise, or descent, is held under lucrative title. (Escriche, Lucrativo.)

An onerous title is one by which we acquire anything paying its value in money, or in something else, or in services, or by means of certain charges or conditions to which we are subjected as purchase, exchange, hiring, and dower. (Escriche, Tit. Oneroso.)

The so-called conditions in this grant are not properly conditions, but restrictions. If they can be regarded as conditions, they are not onerous; they are merely nominal, and the fact that mere nominal conditions are annexed to a grant does not determine the character of the property. If the conditions are burdensome it is an onerous title, and goes to the community; otherwise it is lucrative, and is the separate property of that one of the spouses to which it is granted. (*L. & F. Frique* v. *Hopkins,* 4 Mar. N. S. 214.)

The Texas grants, which have been held by the Courts of that State to be community property were made under the colonization law of Coahuila and Texas, the 22d Section of which provides for the payment by the grantee of a certain sum of money to the State. Those grants, therefore, are essentially different from the grants made to Alviso; they were titles by purchase; this is a gift from the government. The fact of there being a money consideration determines the character of the Texas grants; it is not the amount of the consideration, but the fact of a consideration being exacted, that fixes the character of the property.

As to the custom proved, it could only relate to grants with onerous conditions, and not to grants without such conditions.

*Mathews,* in reply, contended that the conditions annexed to the grant were onerous, and referred to the clause subjecting the grantee to the law of 1824 and the regulations of 1828.

FIELD, J. delivered the opinion of the Court—TERRY, C. J. concurring.

The only question presented by the record for determination, in the present case is, whether the land granted by the Governor of California to Alviso, was his separate property, or the property of the community existing at the time between himself and wife. Alviso intermarried with Maria Luisa Peralta in 1830;

the grant was issued in 1838; Alviso died in 1848; his wife survived him, and was living in 1857. There was no issue of this marriage, but by a previous marriage Alviso had several children, among whom were a son, named Domingo, and a daughter, named Dolores. Domingo márried and had children during the lifetime of Alviso. To his daughter, and the children of his son, Alviso devised the land granted to him, with the exception of certain specified portions. The defendant claims title under Dolores; and whatever interest the widow Maria Luisa possessed, by virtue of her marital rights, in the land, was conveyed by her, in 1857, to Wallace, and by him to the plaintiff.

The case must be determined by the Mexican law in force at the time. If by that law the land was the separate property of the husband, it passed under his will, and judgment must be rendered for the defendant; if it were the property of the community, one-half interest vested in the wife upon the death of the husband, and was not subject to his testamentary disposition. "The wife," says Escriche, "at the death of the husband, acquires full property in, and control of, one-half of the community property of the marriage, and may freely dispose of it, as well by contract *inter vivos,* as by will, without being compelled to preserve it for the children of the marriage, provided, in her devises, she respects the rights of forced heirs." (Diccionario, Tit. Bienes Gananciales.)

The same rule prevails as to the rights of the wife, and the power of testamentary disposition of the husband, in reference to common property, under the statute of this State, as was held in *Beard* v. *Knox,* (5 Cal. 256.) In that case the Court said:

"The husband and wife, during coverture, are jointly seized of the property, with a half interest remaining over to the wife, subject only to the husband's disposal during their joint lives. This is a present definite and certain interest, which becomes absolute at his death, so that a disposition by devise, which can only attach after the death of the testator, cannot affect it, for such a conveyance can only operate after death, upon the very happening of which the law of this State determines the estate, and the widow becomes seized of one-half of the property."

The rule of the Mexican law, as we have stated it, was recognized by this Court in the matter of the estate of Buchanan, de-

cided at the October Term of 1858, (8 Cal. 507.) Buchanan died in June, 1855, leaving property, real and personal; some of the real estate having been acquired previous to the passage of the Act concerning the rights of husband and wife—April 17, 1850— and a portion afterwards; and this Court held that the property—that acquired previously, as well as that acquired subsequently—belonged to the community, (excepting only a portion set apart as a homestead,) and that the same did not pass under the will of the deceased. " The law of Mexico," said the Court, " in force here until our statute took effect, was the same, so far as relates to the merits of this question. The property belonged to the community, and upon the death of the husband the widow took one-half. The husband had the power of disposition while living, but not by will, which could only take effect after his death. (Schmidt's Civil Law of Spain and Mexico, 12, 14, Arts. 43, 44, 51, 52; 1 Cal. 513; 5 Id. 111, 257.)"

It may be observed, that the property in relation to which the decision in the matter of the estate of Buchanan was made, was acquired by *purchase*, although the fact is not stated in the report of the case. It was not essential to the decision that it should have been stated, for the presumption attendant upon the possession of property during the marriage, under the Mexican law, was that it belonged to the community, and exceptions to the rule were required to be proved. (See *Meyer* v. *Kinzer*, 12 Cal. 248, and *Smith* v. *Smith*, Id. 217.)

It is proper to observe, also, that the decision in the Buchanan matter, which we affirm in the present case, does not conflict with the views expressed by Mr. Justice Bennett, in *Panaud* v. *Jones*, (1 Cal. 512,) as to the control of the husband over the common property *after the death of the wife*, and his power of testamentary disposition of the same. Indeed, in that case, the Court cite the authority of Febrero, to the effect that, upon the death of the *husband*, the wife becomes the absolute owner of the one-half of the common property; and then proceeds to show, that, upon the death of the *wife*, the husband still retained the control and right of disposition of the entire common property; that no estate in such property vested in the children on the decease of the mother; that they had only a contingent and defeasible interest in it, which never became perfect until the

death of the father, and then only after the payment of his debts: There is no conflict in the two decisions.

The question then recurs, whether the land granted to Alviso in 1838 was his separate property, or the property of the community. Under the Spanish and Mexican law, property acquired by the husband and wife during the marriage, and whilst living together, whether by onerous or lucrative title, and that acquired by either of them by onerous title, belonged to the community; whilst property acquired by either of them, by lucrative title solely, constituted the separate property of the party making the acquisition. The fruits, and profits, and increase, of the separate property, also, belonged to the community. By onerous title was meant that which was created by a valuable consideration, as the payment of money, the rendition of services, and the like, or by the performance of conditions, or payment of charges to which the property was subject. (Escriche, Tit. Oneroso.) Lucrative title was created by donation, devise, or descent. (Escriche, Tit. Lucrativo.) The Mexican law as to what constituted common property was very similar to the law of this State. Our statute does not seem to provide for property acquired by gift to the husband and wife jointly, but, with that exception, there is no substantial difference, unless, perhaps, the meaning of the term donation, under the Spanish and Mexican law, was more comprehensive than the term in our jurisprudence. The inquiry, then, is whether the property conveyed by the grant was held by Alviso under a lucrative or onerous title; in other words, whether it was a donation or a purchase. The grant purports to convey the land, subject to the approval of the Departmental Assembly, and contains various clauses which are designated in the instrument as conditions. These conditions, as they are termed, are not in fact such, but simple restrictions upon alienation, reservations of easements, and provisions for judicial possession, and the marking of boundaries of the specific tract granted. The first condition provides that neither the grantee or his heirs shall divide or alienate the premises, or subject them to any mortgage or other charge, even for pious purposes, or convey them in *mortmain*. The second condition provides that the grantee may inclose the premises, without prejudice to the roads and easements, and enjoy their free and exclu-

sive possession, subjecting them to such cultivation and use as he may think proper. The third condition provides that, upon the confirmation of the property, the grantee shall request the proper Judge to give him judicial possession, in virtue of his title, and, for that purpose, the boundaries shall be designated, and landmarks placed around the premises. The fourth condition limits the land included in the grant to that designated in the petition of the grantee, and delineated in the sketch annexed, and provides that the Judge giving possession shall report to the government the quantity embraced in the grant. It is evident, from this statement, that the clauses of the instrument which are termed conditions, are not properly such. The first is a restriction; the second is the expression of the power of the grantee with a reservation of easements; the third is a provision for giving bounds and precision to the grant; and the fourth is a specification of the land intended to be conveyed, with a requisition upon the judicial officer to report to the government. There is nothing in any of these provisions which is onerous or burdensome to the grantee, or which can be regarded as a valuable consideration, moving the government to make the grant. Donations may be absolute, or accompanied with conditions, the performance of which may be essential to the enjoyment of the property donated. Thus, a gift of fruits would not lose its character as a gift because accompanied with the condition that the donee should gather them, nor would a gift of land be less a donation because the beneficiary was required to measure off the specific quantity given and designate it by metes and bounds. And it would seem that under the Spanish and Mexican law, a more comprehensive meaning was attached to the term donation than that usually given to it in our jurisprudence. Conditions are sometimes attached to donations which would be regarded at common law as changing the character of the transaction from one of gift to one of purchase. "Donations *inter vivos* and testaments may be made on conditions, and subject to restrictions imposed either on the person or the thing, and they may contain clauses of substitution and restitution." (Schmidt's Civil Law of Spain and Mexico, Art. 966.) "A donation may be made simply and without any condition or incumbrance; or it may be made for a certain time and as remunera-

tion for benefits received." (Id. Art. 988.) "That which is made conditionally remains effective until the condition happen." (Id. Art. 989.) "A donation made on condition that the donee shall do something is revocable, if the donee fail to fulfill· the condition." (Art. 990.)

"Men are sometimes induced to make donations from certain causes or particular reasons, without which they would not have made them; as where one man gives another a sum of money, or an estate, expressly declaring at the time he make the donation that he gives it in order that the donee may, by that means, be always provided with a horse and arms for his service; or where he makes the donation to any artificer, and declares openly that he makes it for certain work or service which the donee was to render him. Wherefore, we say, that if the person who receives a donation in the manner above mentioned, complies with the agreement or condition, or does that for which it was given, the donation will be valid in every respect; but if he should not comply therewith or faithfully execute that for which it was given, he may be compelled to comply with what he had promised, or to abandon the donation which had been made to him. We likewise say, that if one man give another a vineyard, or garden, or an estate, or any other thing whatever, declaring expressly at the time he made the donation, that he gave the thing with the intention that a certain portion of the fruits arising from it should be given to another person for his maintenance, or to redeem him from captivity, or for any other like purpose, if the donee comply with the object for which it was given, the donation will be valid; and if he should not, the donor may revoke it. And donations of the kind mentioned in this law are called, in latin, *sub modo;* which means, in common speech, a donation made for a certain purpose—so *otra manera.*" (2 Moreau & Car. Partidas, 647, 648.)

In *Gayoso de Lemos* v. *Garcia,* (1 Mar. N. S. 333,) the Supreme Court of Louisiana, in speaking of a claim, asserted by the plaintiffs in that case, that the land granted to their father by the King of Spain belonged to the community, said: "The title of the plaintiffs is founded on a grant made to their father during marriage, and it has been urged that the land thus acquired, entered into and made a part of the community subsisting between

husband and wife.   Whatever support this argument may derive
from the practice which, we believe, has prevailed in some parts
of the State, to regard lands granted by the sovereign as prop-
erty common to both spouses, it is certain that it is not only un-
supported by authority, but that the law most positively says it
shall not be common to both, but that it shall belong exclusively
to the individual to whom the King grants it.   (Novissima Re-
cop. Liv. 10, Tit. 4, Leyes 1, 4, y 5, Febr. p 1.)"

In *Frique* v. *Hopkins et al.* (4 Martin's Rep. N. S. 214,) it was
also claimed that land granted to the ancestor of the plaintiffs,
by the King of Spain, was common property, and the ruling in
*Gayoso de Lemos* v. *Garcia*, was referred to and expressly affirm-
ed.   The consideration, or moving cause of the grant, was stated
in the instrument to be the public good, and in order to increase
the population of the city.   After citing the Spanish law, by
which it was declared, that whatever might be given by the
King, *or another*, to both husband and wife, should belong to
them jointly; but that if given to any one of them, it should be
considered as belonging to the individual to whom it was given,
and mentioning that the commentators understood the law to
apply to all cases coming within its letter, except those where
the King gave in remuneration of services rendered by the hus-
band, when he served without pay, and was maintained at the
expense of the community, and referring, in support of that
view, to a law of the *Fuero Real*, the Court said : " The correct-
ness of the application of these laws to a grant of lands by
the former sovereign of Louisiana, has been contested on two
grounds :

1st.   That there is a material difference between a donation
and a concession.

2d.   That as it appears by all the regulations made here by the
Spanish Government, in relation to concessions for lands, that
the quantity conceded was greater or less, according to the cir-
cumstance of the grantee being married and having children, or
being single; grants made to a man who was married, must be
the common property of both husband and wife.

As to the first of these grounds, we apprehend there is nothing
in it which requires our particular consideration.   We are una-
ble to perceive any material difference between a donation and

Scott *v.* Ward.

a concession of lands, such as the former government of Louisiana was in the habit of granting. It is true, concessions may be made, on consideration moving from the donee, which would take from them the character of a donation. But lands given by the King, without price paid for them, and not in remuneration of any services rendered, certainly are donations. If they be not, we are ignorant under what denomination they should be classed.

The second ground was most relied on in argument. It did not escape our attention in the case already alluded to, though no notice is taken of it in the opinion delivered. But we were unable then, as we are now, to discover in it a sufficient reason for taking the case out of the plain and positive provisions of the statute. The consideration which induced the grant or donation, cannot change its character, unless there is a positive provision of law which makes the exception; as in that given from the *fuero real*, where the thing granted is in remuneration of services rendered at the expense of the community. Were we to take this as valid ground for evading the positive enactment of the Legislature, it would lead us, we apprehend, much further than is contemplated by those who press it on our adoption. By the regulations of the Spanish Government, if the individual who applied for land was unmarried, a certain quantity of land was given to him; if he had a wife, this quantity was increased; and if he had children, an additional number of acres were conceded. Now if the circumstance of his being married made the thing given become the property of both husband and wife, we must, on the same principle, hold, that where children were the moving cause, they, too, should be considered as owners in common of the land conceded. But that such was the effect of the donee having a family, we believe was never even suspected—it certainly is unsupported by law. Many donations are made, in which the donee's having a wife, and being burdened with a large family, is a great consideration for the beneficence of the donor; but this motive in him does not prevent the person to whom the gift is made, from being considered its owner, nor prevent the thing given from descending to his heirs.

It was, however, said that the object in making these grants was to encourage the settlement of the country; and that to

carry that object into effect, it was necessary that the lands should be considered as given to both husband and wife.   To this it might be answered, and with great force, that if the government were of that opinion, it is strange they did not at once say so, and by making the concession in the name of both, place the matter beyond doubt; and not, by granting it to one of the spouses, leave it to the operation of a positive law which repelled the idea.   But if we could enter into political considerations, in order to ascertain whether they could repeal statutes, we would, in this case, be led to the examination of a nice and refined question of policy in relation to the effect on national prosperity, of giving to the wife a distinct interest in the property acquired during marriage, one on which men would be found to differ according to their education and particular modes of thinking."

To these Louisiana cases, and the absence of express onerous conditions in the grant, the plaintiff only answers that the grant in question was issued under the colonization laws of Mexico, and that, by force of them, onerous conditions were necessarily implied.   We do not understand that such conditions were necessarily attached to colonization grants.   There may be a mark ed difference between the concessions in the Louisiana cases and the grants made under the decree of 1824, and the regulations of 1828.   The object of that decree and those regulations was the settlement of the vacant lands of the republic, and for that purpose grants were generally made subject to the conditions of cultivation or occupancy.   But where, as in the present case, such occupancy already existed, accompanied with the construction of a house, and its habitation, it would have been to no purpose to have inserted the condition.   The fact of occupancy may have been, and probably was, the reason both for the issuance of the grant, and the omission of the usual condition.   But the reason moving the government constituted no consideration changing the character of the grant from a donation to a purchase.   It created no obligation, and conferred no rights.

We are of opinion that the grant in question was a simple donation, and that the land it contained constituted the separate property of Alviso, and passed under his last will and testament; and as a conclusion therefrom that the judgment must be affirmed.   Ordered accordingly.

Scott *v.* Ward.

On rehearing, at a subsequent term, the following opinion was delivered by FIELD, C. J.—BALDWIN, J. and COPE, J. concurring:

Since the rehearing ordered in this case was had, we have carefully reviewed the opinion delivered at the April Term, and are satitfied that its conclusion as to the character of the grant in question is correct. If it be admitted, as contended by the counsel of the plaintiff, that the usual conditions of cultivation and occupancy were annexed to the grant by force of the decree of 1824, and the regulations of 1828, the result would be the same. These conditions would not change the transaction from that of donation into one of contract or purchase. Their performance constituted no consideration to the government in the nature of a price for the land. They were annexed to colonization grants, in furtherance of the general policy of the republic in the settlement of the country, and their performance was exacted to prevent that policy from being defeated. They only operated as a requirement that the lands should be appropriated to the purposes for which they were granted.

The recital in the grant that the grantee solicited the land "for his personal benefit and that of his family," cannot control the operative words of the grant. In point of fact the recital is untrue. The petition is set forth in the record, and contains no mention of the petitioner's having any family. In it the petitioner solicits the land "to secure the cattle and horses which he has"—and states no other object for which the land was desired. The recital was probably taken from the usual forms in which grants were written; it certainly was not inserted or intended to have any influence upon the direction of the title. The grant is made to Alviso individually, and its terms determine the person in whom the property vested.

The term "family" is not limited to the husband and wife. Alviso had at the time several children by a previous marriage, and if the use of the term in the recital can have any effect upon the direction of the title, it is difficult to see why those children might not claim to have received an interest in the property equally with the wife, or the community existing between the husband and wife. Such an effect was never supposed to exist, it is believed, by any one. Judgment affirmed.

See *Noe* v. *Card*, decided at the January Term, 1860.